UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------X
                                      :
KATHERINE CRUZ, as Natural Guardian   :
o/b/o ANTHONY VEGA, an Infant         :
                                      :        04 Civ. 9794 (DLC)
                 Plaintiff,           :
                                      :        OPINION AND ORDER
         -v-                          :
                                      :
JO ANNE B. BARNHART, as Commissioner  :
of Social Security                    :
                                      :
                 Defendant.           :
                                      :
-------------------------------------X

Appearances:

For Plaintiff:

Michael D. Hampden
Legal Services for Children, Inc.
271 Madison Avenue, Suite 1007
New York, New York 10016

For Defendant:

Susan D. Baird
Assistant United States Attorney
86 Chambers Street, Third Floor
New York, New York 10007


DENISE COTE, District Judge:

     On behalf of her infant son, Anthony Vega ("Vega"),

plaintiff Katherine Cruz ("Cruz") filed this action on December

14, 2004, pursuant to the Social Security Act (the "Act"), 42

U.S.C. § 405(g), to obtain review of the final decision of the

Commissioner of Social Security ("Commissioner") denying his

application for disability benefits.  The Commissioner moves for

remand on the ground that the Administrative Law Judge ("ALJ")

did not properly explore Vega's psychological problems or

consider related clinical records.  Cruz cross-moves for judgment

on the pleadings, contending that the record establishes that
Vega meets the Social Security Administration's ("SSA") listing
for mental retardation in individuals under eighteen.  In the
alternative, Cruz moves for remand to the Commissioner.  For the
reasons stated below, Cruz's motion for judgment on the pleadings
is granted.


## Background

The following facts are taken from the administrative
record.


## Social History

Vega was born on February 3, 1998.  During her seventh month
of pregnancy, Cruz was hospitalized for three weeks due to a leak
of amniotic fluid; Vega was born, however, during Cruz's ninth
month of pregnancy, and she experienced no problems in delivering
him.  Cruz has acknowledged drinking into her third or fourth
month of pregnancy because she was not aware that she was
pregnant.

Until Vega was approximately eighteen months old, he and
Cruz lived with Vega's father, who has a history of drug and
alcohol abuse and was physically abusive toward Cruz.  According
to Cruz, Vega not only heard frequent arguments between her and
Vega's father, but also witnessed physical violence.  When Cruz
"decided that she would not continue to put up with the
violence," Cruz moved back home with her mother.  As of the time

of the hearing, Vega lived with Cruz, Cruz's mother, three brothers, and Cruz's daughter.  Cruz has described her own dominant languages as both English and Spanish, and given his home environment, Vega understands Spanish.  Vega's first language is English, however, and he communicates in English with his family and friends.

While Vega met many developmental milestones as an infant or toddler, throughout his life, Vega has not been able to "use words to express his wants or needs."  Instead, as Cruz has described to several professionals, he often "grunts, points, takes adults to what it is he wants" or has tantrums.  Vega is understood only by Cruz, who nonetheless has difficulties understanding him.  According to some observations, Vega is "very hyper" and needs "constant adult one to one supervision," particularly given his tendency to "dart off" outside the home. Cruz also reports that Vega regularly urinates on himself and cannot dress himself without assistance.

Vega has also exhibited violent tendencies throughout his young life.  Although he has been assessed to be "friendly and not afraid of strangers," Cruz asserts that Vega regularly hit his sister and "smack[ed] her in the face" for not sharing her toys.  Cruz has also explained that Vega "screams all the time," "hits people in the street," and "picks up anything and everything, not caring if it hurts someone or not."  Vega has participated in play therapy "to address the violence he experienced at home."

<u>Medical and Evaluative History</u>

The earliest health records included in the administrative record are from Vega's March 14, 2000 well-child examination by Dr. Allison Cohen ("Dr. Cohen"), a resident at Mount Sinai Hospital.  Dr. Cohen noted that Cruz "was concerned about [Vega's] speech" and that Vega was "still only saying Mama/Dada [and] grunting to express wants."  Dr. Cohen further reflected that as Vega "seems not to be progressing," she would refer him to an early intervention program.

Pursuant to Dr. Cohen's referral, on May 16, 2000, Conchita J. Fluitt ("Fluitt") of the Marathon Infants and Toddles Program ("Marathon") performed a bilingual educational evaluation of Vega, employing the Carolina Curriculum for Handicapped Infants and Infants at Risk as her primary testing protocol.  Fluitt observed that Vega, who was then two years and three months of age, did not exhibit "difficulties with transition and processing language" and was neither delayed cognitively nor in terms of his receptive language development.  He also was assessed to have age-appropriate "self help" skills.  Fluitt opined, however, that Vega demonstrated signs of delay in terms of his socio-emotional development.  Fluitt also determined that Vega was significantly delayed with respect to his expressive language capacity, especially as his speech was "unclear and difficult to understand" and was limited to one word utterances.  On a form she completed pursuant to her evaluation, Fluitt rated Vega as having a 33 percent or more delay in communication and a 25

4

percent or more delay in his social and emotional development. Given these results, Fluitt concluded that early intervention services were appropriate for Vega.

Another professional associated with Marathon, Carol Nelson ("Nelson"), also assessed Vega in May 2000, performing a "bilingual speech and language evaluation" in Cruz's home. Nelson observed that Vega communicated using vowel sounds, eye contact, and gestures, and that while he responded to both English and Spanish, he could not verbalize in either language. Overall, based on her "informal evaluation through play and conversation," Nelson opined that Vega had "low average language comprehension abilities and expressive language abilities at the 7-9 month level." On this basis, she concluded that he was delayed by at least 67 percent in expressive language and recommended English speech/language therapy. On the basis of these two evaluations, in December 2000, Vega began to receive services, including daily classes, one-on-one speech therapy three times each week, and social work services, from New York City's Early Intervention Program.

On December 21, 2000, Dr. Cohen again examined Vega. Her notes from that visit express that Vega was "potty trained" but that his speech was limited to five to six words. On May 10, 2001, when Vega was three years old, Dr. Cohen saw Vega for a third time and observed that Vega's speech was "hard to understand." In response to Cruz's description of Vega's "heavy breathing" and frequent coughing when sick, Cohen noted that

Vega's symptoms could be either asthma or seasonal allergies. Several months later, on June 7, 2001, Dr. Cohen evaluated Vega and completed a related report for the New York State Office of Temporary and Disability Assistance. As Vega failed to "meet development milestones for [his] age," she diagnosed him with "developmental and speech delay" but concluded that Vega neither presented signs of a significant psychiatric disorder nor demonstrated physical or neurological abnormalities.

On June 27, 2001, a three-year, four-month-old Vega was assessed by Dr. Emma Florez ("Dr. Florez") of Diagnostic Health Services, Inc. ("DHS"). According to Dr. Florez's report, Vega was "toilet trained at the age of 29 months," was capable of dressing and undressing by himself, and "alternates feet on stairs, eats by himself, follows commands, understands taking turns, and holds a crayon in an adult fashion." On this basis, she determined that Vega's "[e]ating, feeding, dressing, playing, and home activities are at full range." Nevertheless, Dr. Florez noted Vega's limitations in two areas. First, Dr. Florez discussed Vega's "behavioral problem[s]," which she described in terms of his hyperactivity, aggression, and frequent fighting with his sister. More significantly, Dr. Flores stated that while Vega's first words were at two years old, "he does not say any sentence as yet" and "says only about ten words." As a result, she concluded that he would need "intensive and prolonged speech therapy." Overall, Dr. Florez's impression was one of "[d]elayed speech development" and "[s]econdary hyperactivity."

On the same day, Vega was also evaluated at DHS by Harry Wakslak, Ph.D. ("Dr. Wakslak"), a psychologist. Contrary to Dr. Florez, Dr. Wakslak reported that Vega was not toilet trained and "wears Pampers," and that he could not "dress himself." As for Vega's communication skills, Dr. Wakslak determined that despite being "alert and responsive to external surroundings," Vega neither could talk nor respond to questions "in a functional manner." He also noted that throughout the session, Vega was "defiant, oppositional, and somewhat hyperactive." Dr. Wakslak explained that as Vega "refused to follow simple step commands and body identifications," he could not properly assess Vega's receptive language skills. Dr. Wakslak did evaluate Vega, however, on Raven's Progressive Matrices Test, finding that Vega functioned between the fifth and tenth percentiles. Dr. Wakslak reported that "[t]his level of performance places him within the borderline level of intelligence (IQ 73)." On the whole, therefore, Dr. Wakslak concluded that Vega exhibited "[b]orderline intelligence" and both expressive and receptive language dysfunction requiring "ongoing speech and language therapy." In addition, Dr. Wakslak opined that Vega would "benefit from participating in a full-time special education early intervention program."

Approximately one month later, on July 20, 2001, Vega was evaluated by Nori E. Wallshein, a speech pathologist at the Manhattan Speech and Language Center. Wallshein administered several tests to Vega. Using the Preschool Language Scale-3

("PLS-3"), Wallshein found Vega to display an approximate thirty-month delay in auditory comprehension skills and an eighteen-month delay in his expressive communication skills. Among the tasks Vega could not complete were "following simple directions without gestural cues," "answer[ing] what, where, and yes/no questions," and "produc[ing] basic sentences." Wallshein then attempted to administer the Goldman-Fristoe Test of Articulation-2, but abandoned that test when Vega "did not label or imitate the test terms." Nevertheless, she assessed his speech to be "intelligible approximately 75% of the time during spontaneous speech." In assessing his language skills, Wallshein concluded that Vega's "mean length of utterance is mildly delayed for his chronological age" and that he "exhibited moderate delays in his morphological-syntactic skills." On the other hand, Wallshein found that Vega was "beginning to respond to contingent queries and to make rapid topic changes." Surmising that Vega's delayed speech and language development could be the result of recurrent ear infections, Wallshein concluded that Vega's potential for improvement was "good" given that "children with similar delays have demonstrated improvement with speech and language therapy and parental involvement."

In fall 2001, Vega approached the end of his eligibility for Early Intervention services and required new evaluations to qualify for services through the Committee on Preschool Education ("CPSE") of the New York City Board of Education. On the basis of a referral from CPSE, on September 5, 2001, Vega was evaluated

by three professionals at the Village Child Development Center ("VCDC"). First, Eileen M. Laide ("Laide"), a bilingual speech-language pathologist with VCDC, performed a bilingual speech and language evaluation. At the outset, Laide noted that Vega communicated through "one through four word utterances, gesture, social affective signaling, vocalizing, and crying." She also observed that while Vega had been "exposed to some Spanish," his home environment was "predominantly English-speaking" and that his Spanish language skills were "quite limited." In evaluating Vega's behavior, Laide found him to "particularly resist book tasks as test items became more challenging for him," stated that he occasionally refused to answer test items that he perceived as difficult, and determined that he had "tremendous difficulty processing questions." On the basis of the Westby Play Scale, she assessed his play skills as equivalent to 24 months.

Laide's efforts to test Vega's language skills offered mixed results. On one hand, her attempt to administer the Expressive One Word Picture Vocabulary Test-Revised had to be discontinued after Vega failed to achieve "a basal score of six correct responses at the two-year-old level." Laide also administered the PLS-3 Spanish edition, cautioning that "the results of these tests must be interpreted cautiously since they were neither developed nor normed on bilingual populations." On the basis of the PLS-3, Laide assessed Vega to have a receptive language capacity of 30-35 months, constituting a 25 percent delay, and an expressive language capacity of 24-29 months, amounting to a 33

percent delay.  In particular, Laide deemed Vega's grammatical
development to be "quite delayed" and observed that "he was
unable to produce basic sentences when confronted with a topic."
She also expressed that Vega may have "[a]uditory processing
deficits" given his "difficulty with verbal commands and
instructions."  Overall, she recommended continued speech and
language therapy.

Laide's colleague at the VCDC, Trace P. Larson ("Larson"),
performed a bilingual psychological evaluation of Vega.  Larson's
observation of Vega's behavior noted that Vega "was responsive to
redirection and limit setting" and that "[n]o discipline problems
or maladaptive behaviors were observed."  Larson noted, however,
that Vega exhibited "language delays that impede age-appropriate
conversation" and that his "[e]xpressive language consisted
primarily of simple rote phrases."  Larson then administered the
Stanford-Binet Intelligence Scale: Fourth Edition ("Stanford-
Binet") in English and Spanish.  Like Laide, Larson explained
that his results would be "presented in a descriptive qualitative
manner and should be interpreted with caution because of the
absence of appropriate local norms and deviations from standard
procedures to accommodate bilingual issues."[1]

On the whole, Larson found Vega's performance on the
Stanford-Binet to fall within the borderline range as he
demonstrated "a developmental age of approximately 30 months" and

---

[1] In his recommendations, however, Larson considered his
evaluation results to be "an accurate measure of [Vega's] current
levels of functioning."

a "moderate delay of 25 percent in his overall cognitive functioning." Within the component areas of the test, Larson reported that Vega displayed a developmental age of approximately 21 months in verbal reasoning skills, constituting a "significant delay" of 33 percent and falling within the deficient range. By contrast, Larson assessed Vega to be within average range in the abstract/visual reasoning, quantitative reasoning, and short-term memory components of the test.[2] At the time of administration, Larson did not assign Vega an IQ score.

Aside from performing the IQ test, Larson also administered the Vineland Adaptive Behavior Scales: Interview Edition using Cruz as the respondent. On the basis of Cruz's reporting, Larson found Vega to fall within the "moderately low range" with a development age of approximately 32 months. In summarizing his findings, Larson noted Vega's inability to "produce complete simple sentences and phrases of at least four words" but also noted his "ability to self-feed using a spoon and fork," the fact that he is "fully toilet-trained for both day and night," and his requiring "only minimal assistance with bathing and dressing." Larson also characterized Vega as "a happy and friendly child who plays well alone and with others." Overall, Larson recommended that Vega be placed in a "preschool program with teaching strategies to address specific needs" and that he receive "speech

---

[2] Larson's final sentence reads, "Kevin's overall performance within the areas of Quantitative Reasoning and Short-Term Memory is within normal limits." It is unclear whether Larson simply erred in editing his report or whether his report accidentally incorporated data on another child.

and language instruction."

        The last VCDC-related assessment was performed by Jacqueline
Rosado-Prowell ("Rosado-Prowell"), who conducted a bilingual
educational evaluation of Vega using the Hawaii Early Learning
Profile (HELP) Checklist from ages three to six and the Carolina
Curriculum for Preschoolers with Special Needs.  Rosado-Prowell,
like Laide and Larson, warned that "formal tests administered are
not normed for linguistically and culturally diverse Spanish
speaking children" and that test results obtained should
therefore be viewed as "estimates only."  While describing Vega
as "distracted and impulsive," Rosado-Prowell observed that Vega
displayed an "adequate attention span" when activities appealed
to him and exhibited "persistence and motivation" with the
different tasks the testing required.  Rosado-Prowell also
described Vega as "verbal" but noted his "poor intelligibility"
and that he was "difficult to understand."  Deeming his motor
skills and "self help" skills to be age-appropriate, Rosado-
Prowell concluded that Vega demonstrated a ten-month delay in his
cognitive abilities, a 23-month delay in his language skills, and
a 19-month delay in his social development.

        With respect to his language development, Rosado-Prowell
determined that Vega used "short, simple utterances" but
possessed the ability to "communicate his wants and needs during
testing."  In both the language and cognition realms, Rosado-
Prowell observed Vega becoming distracted, impulsive and non-
compliant during transitions from one task to another and

requiring either prompts or firm limit setting to attend to the task at hand.  She recommended that Vega receive early intervention services to address his areas of "delay and need."

On October 23, 2001, Vega was accepted into a special education preschool program, and the CPSE agreed to provide twice-weekly speech/language therapy as well.  Vega's preschool teacher completed a December 14, 2001 report concerning Vega for the New York State Office of Temporary and Disability Assistance. She reported that Vega did not "exhibit inappropriate social interaction behavior" and did not "demonstrate problems in performing age-appropriate self-care activities."  She responded, however, that the intelligibility of Vega's speech was fair and that his "ability to produce speech at an acceptable rate for a useful period of time" was poor.

On January 8, 2002, Vega had his first seizure, prompting a visit to the emergency room at Mount Sinai.  Upon intake, Cruz reported that while they were watching TV, she noticed Vega's body shaking with his "eyes rolled up," at which point he fell to the floor and continued shaking for about five minutes.  She further explained that during the seizure, Vega "froth[ed] at the mouth" and became incontinent.  Cruz reported that Vega's grandmother and uncles had a history of seizures.   After examining him, Dr. Bowlby discharged Vega with instructions that Cruz take him to see a pediatric neurologist, schedule a electroencephalogram ("EEG") for him, and return to the emergency room immediately if he had another seizure.  Three days later, on

January 11, 2002, Vega returned to the outpatient department at Mount Sinai, where Cruz reported that Vega had had another "episode" the night before. Following a medical examination, Cruz was again instructed to schedule both an EEG and CT scan for Vega. On January 31, 2002, Dr. James Rowan, a pediatric neurologist, evaluated Vega and reported that Vega's EEG was "normal" during the child's wakefulness, drowsiness, and a brief period of sleep.

The record indicates that Vega was next seen at Mount Sinai by Dr. Cohen on March 12, 2002, shortly after his fourth birthday. Dr. Cohen found Vega to be "combative" during that visit. With respect to his physical health, however, she noted that Vega's asthma was well-controlled, and that following the above-noted EEG and a CT scan, Vega had been prescribed Dilantin to control his seizures. Dr. Cohen expressed that Vega had been "seizure free" and was experiencing no side effects from the Dilantin.

Procedural History

On April 25, 2001, Cruz applied for SSI benefits for Vega. Several months later, on December 14, 2001, Dr. Paulette Harar ("Dr. Harar"), a review physician in the pediatrics division of the New York State Office of Disability Determinations, completed a childhood disability evaluation form with respect to Vega's condition, concluding that while Vega's impairments were severe, he did not qualify as disabled. Specifically, Dr. Harar noted

that Vega had a marked limitation in acquiring and using information given his score of 73 on Raven's Progressive Matrices Test. She further observed that he had a less than marked limitation in interacting and relating with others given that his spontaneous speech is around 75 percent intelligible. In the areas of attending and completing tasks, moving about and manipulating objects, caring for yourself, and health and physical well-being, she concluded that Vega had no limitations. Therefore, despite acknowledging Vega's "borderline IQ" and speech and language delays, Dr. Harar concluded that Vega was not disabled. Based on Dr. Harar's findings, Vega's SSI application was denied on January 3, 2002.

Shortly thereafter, Cruz requested a hearing, explaining that Vega needed SSI benefits because "he is not a regular kid." At the May 1, 2002 hearing, Cruz appeared <u>pro se</u> and without Vega. Cruz informed the ALJ that she felt that Vega was entitled to SSI benefits "because he doesn't speak" and "I don't understand what he wants." Cruz further explained, "He gets, well, to me he gets very annoying. I don't understand him. He's sick." When asked by the ALJ to explain Vega's sickness, Cruz mentioned Vega's seizures but noted that they were controlled by medication. She then clarified that the seizures were sometimes controlled, but that Vega would soon be receiving "stronger medication" because the seizures were "coming back again" despite

the medication.[3]  Vega further explained, upon questioning by the
ALJ, that Vega had last had a seizure that morning and that as
recently as two months prior, he had been having seizures "like
four times a day."  Cruz added that Vega's doctors had found
"something round and small in his brain" and presented the ALJ
with an appointment slip for a July 8, 2002 MRI.

Cruz then testified to Vega's other health problems, noting
that he had a heart murmur and that despite her efforts to toilet
train him, he didn't "know how to use the bathroom" and had to be
"on Pampers or a diaper."  In addition, Cruz explained that Vega
had had asthma for a year and a half.  While acknowledging that
Vega had never been hospitalized for his asthma, Cruz stated that
she had last been to the ER with Vega approximately three weeks
earlier and had taken him there "[a] couple of times" since
applying for SSI benefits in April 2001.  Noting the lack of
medical records in Vega's file pertaining to his asthma and
seizures, the ALJ requested that Cruz collect any treating
records for Vega's asthma and epilepsy from Mount Sinai and
return them to her.  After Cruz represented that Vega had been
undergoing psychiatric treatment at Mount Sinai for the past
three months, the ALJ noted that she had no records of Vega's
psychiatric treatment at Mount Sinai either and asserted that she

_____

[3] At this point in the hearing, a Spanish interpreter in
attendance attempted to intervene so that Cruz could better
express herself.  Cruz herself stated, "I want you to understand
what I'm talking about because sometimes I'm bad in English."
The ALJ resisted his efforts, however, stating that Cruz spoke
English "very well" and that she would ask Cruz to explain
further if she didn't understand.

needed these treatment records as well.

The ALJ then emphasized that the records in her possession concerned only Vega's speech development. In response, Cruz explained that Vega "still doesn't communicate with no one," and that his efforts to communicate on the basis of movement were not understood by anyone other than her. When the ALJ inquired about Vega's ability to care for himself, Cruz stated that he was unable to dress or undress himself, that he was very messy in feeding himself, that he did not put away his toys, and that he did not have any friends save for a male child with whom he received psychiatric treatment and at whom he did not "get mad." Cruz further testified that Vega played with blocks and with toy cars and trains, but that he did not ride a bicycle and wrote "all over the wall" when given crayons. Finally, when the ALJ asked Cruz if Vega was experiencing any side effects from the medication, Cruz stated that Vega had lost his appetite, lost three pounds in two-and-a-half weeks, and that "his blood level is not the same."

Following the hearing, through a May 23, 2002 letter, the ALJ notified Cruz that she had held the record open in order for Cruz to submit treating notes and records but had not yet received any such documentation. The May 23 letter further explained that the record would be held open for one more week, and encouraged Cruz to notify the ALJ by phone or mail if she needed help in obtaining the pertinent records. The letter concluded by informing Cruz that if she did not respond by June

3, the ALJ would assume that no available records exist and would make a decision "based on the record as it stands." It is unclear whether Cruz responded to this letter.

On August 26, 2002, the ALJ rendered her decision, noting that "the claimant did not submit any records even after my correspondence reminding her" to do so. While determining that Vega's speech and language delays, borderline intellectual functioning, asthma, and seizure disorder all constituted severe impairments, the ALJ concluded that Vega was not disabled within the meaning of the Act on the ground that the record lacked clinical or laboratory findings that met any impairment included in the SSA's listings. See 20 C.F.R. Pt. 404, Subpart P, App. 1 (the "Listings"). She also concluded that Vega's impairments were not functionally equivalent to any impairment in the Listings. Specifically, the ALJ determined that while Vega had a marked impairment in acquiring and using information, he had less than marked limitations in attending and completing tasks and interacting and relating with others and no limitations in moving about and manipulating objects, caring for himself, and his health and physical well-being.

Following the appointment of a legal representative for Vega on October 23, 2002, an appeal ensued. On October 14, 2004, the Appeals Council denied Cruz's request for review, thereby finalizing the Commissioner's decision.

Discussion

I.  Legal Standard

In reviewing the decision of the Commissioner, a district court may "enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing."  42 U.S.C. § 405(g).  A court must uphold the Commissioner's decision unless it is unsupported by substantial evidence or is based on an erroneous legal standard.  Curry v. Apfel, 209 F.3d 117, 122 (2d Cir. 2000).  Substantial evidence in this context means "more than a scintilla.  It means relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Halloran v. Barnhart, 362 F.3d 28, 31 (2d Cir. 2004) (citation omitted).  It is not the function of the reviewing court to determine de novo whether a claimant was disabled.  Curry, 209 F.3d at 122.

Given the "essentially non-adversarial nature of a benefits proceeding," "it is the ALJ's duty to investigate and develop the facts and develop the arguments both for and against the granting of benefits." Butts v. Barnhart, 388 F.3d 377, 386 (2d Cir. 2004) (citation omitted).  It is well-settled that the ALJ is not required to "reconcile explicitly every conflicting shred of medical testimony." Fiorello v. Heckler, 725 F.2d 174, 176 (2d Cir. 1983) (citation omitted); Mimms v. Heckler, 750 F.2d 180, 186 (2d Cir. 1984) (the ALJ's credibility determination is subject to deference).  "Where there are gaps in the

19

administrative record," a remand for further development of the evidence is appropriate.  Rosa v. Callahan, 168 F.3d 72, 82 (2d Cir. 1999) (citation omitted).  Reversal and entry of judgment for the claimant is appropriate only "when the record provides persuasive proof of disability and a remand for further evidentiary proceedings would serve no purpose."  Parker v. Harris, 626 F.2d 225, 235 (2d Cir. 1980); see also Rosa, 168 F.3d at 83 (remand solely for calculation of benefits is appropriate where there is "no apparent basis to conclude that a more complete record might support the Commissioner's decision").

A.   Disability in Claimants Under 18

Where a claimant is under eighteen years of age (a "child claimant"), a finding of disability will be made if he can demonstrate that he has "a medically determinable physical or mental impairment, which results in marked and severe functional limitations, and which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months."  42 U.S.C. § 1382c(a)(3)(C)(i).  A child claimant who engages in "substantial gainful activity" may not be considered to be disabled.  Id. at § 1382c(a)(3)(C)(ii).

A three-step process is used by the Commissioner and the ALJ to assess a child's disability claim.  See 20 C.F.R. § 416.924(a).  First, the Commissioner must consider whether the child claimant is working and if so, whether the work constitutes

"substantial gainful activity."  20 C.F.R. § 416.924(b).  If the

child claimant is not engaged in substantial gainful activity,

the Commissioner must next determine whether he has a "medically

determinable impairment(s) that is severe."  Id. at § 416.924(c).

An impairment that amounts to no more than a "slight abnormality

or a combination of slight abnormalities that causes no more than

minimal functional limitations" does not constitute a severe

impairment.  Id.  Finally, if the child claimant suffers such a

severe impairment, the Commissioner must determine whether the

impairment meets, medically equals, or functionally equals an

impairment in the Listings.  Id. at § 416.924(d).  A child's

impairment is medically equal to an impairment in the Listings if

it is "at least equal in severity and duration" to a listed

impairment.  Id. at § 416.926(a).  By contrast, a child claimant

possesses the functional equivalent of a listed impairment if he

demonstrates an "extreme"[4] limitation in one of six domains of

functioning or "marked"[5] limitations in two domains.  Id. at §

416.926a(a).  For children ages three to eighteen, the six

domains of functioning are: "[a]cquiring and using information;"

"[a]ttending and completing tasks;" "[i]nteracting and relating

_____

[4] A limitation in one of these areas is defined as "extreme"
when a child has an impairment that "interferes very seriously
with [his] ability to independently initiate, sustain, or
complete activities."  Id. at § 416.926a(e)(3)(i).  An extreme
limitation "does not necessarily mean a total loss of ability to
function" but is the rating given to the "worst" limitations and
is considered equal to a standardized test score that is three
standard deviations below the mean.  Id.

[5] The definition of a marked impairment will be discussed
infra.

with others;" "[m]oving about and manipulating objects; "[c]aring for yourself;" and "[h]ealth and physical well being."  Id. at § 416.926a(b)(1)(i)-(vi).

II.  Cruz's Motion for Judgment on the Pleadings

In the instant case, the ALJ determined that Vega fulfilled the requirements of steps one and two in the three-step analysis used to analyze a child's claim of entitlement to SSI benefits. According to the ALJ's decision, Vega had never engaged in any substantial gainful activity, and his speech and language delays, borderline intellectual functioning, asthma, and a seizure disorder constitute severe impairments.  At step three, however, the ALJ concluded that these impairments did not meet, medically equal, or functionally equal any of the SSA's listed impairments. In moving for judgment on the pleadings, Cruz argues that the ALJ not only failed expressly to consider the mental retardation listing,[6] but also contends that the record conclusively demonstrates that Vega satisfies three variations of the listing for mental retardation, Listings 112.05D, 112.05E, and/or 112.05F.  See id. at Pt. 404, Subpart P, App. 1, § 112.05D-F.

The Listings provide that mental retardation in individuals under eighteen is "[c]haracterized by significantly subaverage general intellectual functioning with deficits in adaptive functioning," as evidenced by the fulfillment of one of six

--------

[6] Indeed, the ALJ's decision does not mention any specific listed impairment.

additional criteria, labeled A through F, and set out at Listing
112.05.  Id. at § 112.05.  The Listings make clear, however, that
in order to qualify as mentally retarded, a claimant not only
must fulfill one of the A through F criteria, but also must
"satisf[y] the [introductory] diagnostic description."  Id. at §
112.00A.

     Listings 112.05D and 112.05E both require that a child
between three and eighteen years of age have "a valid verbal,
performance, or full scale IQ of 60 through 70."  Id. at §
112.05D-E.  Listing 112.05D also requires a showing of "a
physical or other mental impairment imposing an additional and
significant limitation of function."  Id. at § 112.05D.  By
contrast, for its second component, Listing 112.05E demands a
showing of either a "marked impairment in age-appropriate social
functioning," "marked impairment in age-appropriate personal
functioning," or "marked difficulties in maintaining
concentration, persistence, or pace."  Id. at § 112.05E
(referencing § 112.02B(2)(b)-(d)).  "Standardized intelligence
test results are essential" for classifications of mental
retardation under Listings 112.05D and E.  Id. at § 112.00D(11).

     If "the results of standardized intelligence tests are
unavailable," such as "where the child's young age or condition
precludes formal standardized testing," mental retardation may be
proven only through Listings 112.05A, 112.05B, and 112.05F.[7]  Id.

_____

[7] The Listings provide that the Commissioner may make
exceptions for "formal standardized psychological testing" where
"appropriate standardized measures for the child's social,

23

Listing 112.05F requires a showing of "marked impairment in age-appropriate cognitive/communicative function" combined with that of a "physical or other mental impairment imposing an additional and significant limitation of function." Id. at § 112.05F (referencing § 112.02B(2)(a)).

Cruz argues that Vega satisfies the first requirement of Listings 112.05D and 112.05E -- "a valid verbal, performance, or full scale IQ of 60 through 70" -- through his score on the Stanford-Binet test administered by Larson in September 2001. The reliability of this score is questionable. First, in his report, Larson himself warned that the results of the Stanford-Binet "should be interpreted with caution" given "the absence of appropriate local norms and deviations from standard procedures to accommodate bilingual issues." More significantly, no score was assigned to Vega's performance on the Stanford-Binet until months after the ALJ issued her decision. Rather, through an October 22, 2002 letter to Vega's counsel -- well over a year after administering the test -- Larson explained that "[r]esults

_____

linguistic, and cultural background are not available." Id. at § 112.00D(16). Given that the portions of the Listings concerning "standardized intelligence test results" are intermingled with those addressing "standardized psychological testing," it may be that the former is a subset of the latter. See 20 C.F.R. Pt. 404, Subpart P, App. 1, § 112.00D(6)-(16). Nevertheless, Listing 112.00D(11) suggests that the requirement of a valid IQ test cannot be waived for adjudications under Listings 112.05D and 112.05E. See Campos ex rel. Cruz v. Barnhart, No. 01 Civ. 10005 (SAS), 2003 WL 21243036, at *7 n.8 (S.D.N.Y. May 28, 2003) (Listings 112.05D and 112.05E "arguably do not apply" where validity of I.Q. test is in dispute). As the parties do not address this issue, however, it need not be resolved at this time.

of the evaluation indicate that [Vega's] verbal reasoning ability
is equivalent to a standard score of 67 or below."  Given the
questionable reliability of the test itself, the fact that the
score was not furnished to the ALJ, and the significant delay in
assigning a score, the record fails to supply the "persuasive
proof" required to enter judgment for Vega under Listings 112.05D
and/or 112.05E.

Cruz also argues, however, that Vega meets the requirements
of Listing 112.05F, possessing both a "marked impairment in age-
appropriate cognitive/communicative function" and a "physical or
other mental impairment imposing an additional and significant
limitation of function."  With respect to the first prong of
Listing 112.05F, Cruz contends that the ALJ's finding that Vega
has a marked impairment in acquiring and using information
"compels the conclusion" that Vega also has a marked impairment
in cognitive and communicative functioning.  Specifically, Cruz
asserts that these two categories are interchangeable on the
basis that they have been described by the SSA in "fundamentally
the same terms," that they require "indistinguishable"
evidentiary showings, and that the term "marked" has the same
meaning in both contexts.  As Cruz notes, an impairment is
"marked" where it is

> more than moderate but less than extreme.  <u>A marked
> limitation may arise</u> when several activities or
> functions are impaired, or <u>even when only one is
> impaired</u>, as long as the degree of limitation is such
> as to interfere seriously with the ability to function
> (based on age-appropriate expectations) independently,
> appropriately, effectively, and on a sustained basis.
> When standardized tests are used as the measure of

functional parameters, a valid score that is two
standard deviations below the norm for the test will be
considered a marked restriction.

Id. at § 112.00(C) (emphasis supplied).

In finding that Vega had marked limitations in acquiring and
using information, the ALJ explained that this domain encompasses
"learning, thinking, communication, and sensory perception," as
well as "how well the child acquires or learns information, and
how well the child uses the information the child has learned."
See 20 C.F.R. § 416.926a(g).  Among other findings, the ALJ then
noted that Vega had been adjudged by the CPSE to have a 10-month
delay in cognition, that the June 2001 administration of the PLS-
3 revealed that Vega had a "thirty-three percent delay in
expressive language and a twenty-five percent delay in receptive
language," and that the June 2001 administration of Raven's
Progressive Matrices Test demonstrated that Vega "functioned
within the borderline range of intelligence."

Even if, as the Government contends, the domain of acquiring
and using information is neither identical to nor as expansive as
the category of "age-appropriate cognitive and communicative
function," id. at § 112.02B(2)(a),[8] a claimant need only show an

_____

     [8] In attempting to decipher what is encompassed by "age-
appropriate cognitive and communicative function," the Government
appears to rely on the pre-2001 regulations, under which
"cognitive/communicative function" was one of five domains used
to evaluate functional equivalence.  The fact, however, that the
regulations no longer feature a "cognitive/communicative" domain
and that the "different aspects" of communication are now
addressed in several different domains has no bearing on whether
the ALJ's judgment that Vega had a marked limitation in acquiring
and using information also leads to the conclusion that he had a
marked limitation in "age-appropriate cognitive and communicative

impairment in one activity or function to establish that he has a
"marked" impairment. All that matters is that the claimant's
"degree of limitation" is significant enough to "interfere[s]
seriously with the ability to function (based on age-appropriate
expectations) independently, appropriately, effectively, and on a
sustained basis." Id. at § 112.00C. In resolving that Vega had
marked limitations in acquiring and using information, the ALJ
clearly determined that Vega exhibited cognitive limitations of
this nature. That not all findings of a marked limitation in
acquiring and using information will necessarily equal a showing
of a marked limitation in "age-appropriate cognitive and
communicative function" is beside the point.

Cruz also offers persuasive evidence that Vega meets the
second prong of Listing 112.05F. Pursuant to the listings, a
physical or mental impairment imposes an "additional and
significant limitation of function" where it is a "severe"
impairment. Id. at § 112.00A (quoting 20 C.F.R. § 416.924(c));
see also Castillo ex rel. Sosa v. Barnhart, No. 00 Civ. 4343
(MBM), 2002 WL 31255158, at *9 (S.D.N.Y. Oct. 8, 2002) ("severe"
impairment under § 416.924(c) is "indisputably link[ed]" and
equivalent to an impairment imposing an "additional and
significant limitation of function"). Therefore, the ALJ's
determination that Vega has four severe impairments, a
determination supported by the available evidence, is tantamount
to a finding that each of these impairments satisfies the second

function."

prong of Listing 112.05F.  See Campos, 2003 WL 21243036, at *8
(ALJ's findings of severe impairments "automatically qualify" as
"significant limitation of function" under 112.05F).

That the ALJ's own findings provide "persuasive proof" of
Vega's mental retardation under the two prongs of Listing 112.05F
does not end the analysis, however.  Rather, in order to qualify
as disabled on the basis of mental retardation, a child claimant
must demonstrate "significantly subaverage general intellectual
functioning with deficits in adaptive functioning."  20 C.F.R.
Pt. 404, Subpart P, App. 1, § 112.05.  Cruz argues that Vega
meets this criterion on the basis of the administrative record,
yet her brief primarily focuses on which documents prove Vega's
deficits in adaptive functioning.  Indeed, although she
acknowledges that "intellectual functioning" is "measured by IQ
scores," she nonetheless assumes, without discussion, that proof
of the former component has been established.  This assumption
cannot be sustained.

Until January 2001, when the SSA published revised final
rules for disability determinations, the record on behalf of a
child claimant seeking to establish disability on the basis of
mental retardation did not have to support "a separate finding
with respect to the diagnosis description."  Castillo, 2002 WL
31255158, at *14.  As a result, the case law with respect to what
is meant by "significantly subaverage general intellectual
functioning with deficits in adaptive functioning" is sparse.  In
April 2002, however, the SSA published revisions to the rules for

disability determinations, in which it clarified the meaning of this phrase. Specifically, the SSA provided that the definition of mental retardation featured in the listings is "consistent with, if not identical to, the definitions of MR used by the leading professional organizations," all of which "require significant deficits in intellectual functioning, as evidenced by IQ scores of approximately 70 or below." <u>Technical Revisions to Medical Criteria for Determinations of Disability</u>, 67 Fed. Reg. 20018, 20022, <u>available at</u> 2002 WL 661740 (Apr. 24, 2002). As an example, the SSA cited the Diagnostic and Statistical Manual-IV ("DSM-IV"), which is promulgated by the American Psychiatric Association and states that "significantly subaverage general intellectual functioning" is embodied by "an IQ standard score of approximately 70 or below." <u>Id.</u> (citation omitted).

Although Vega's verbal IQ has been assessed to fall below 70, for reasons already described, that score presents reliability issues. The score was also unavailable to the ALJ at the time she made her decision, as Larson did not assign a numerical value to Vega's performance on the Stanford-Binet until October 2002. Therefore, Cruz has failed to provide persuasive proof that Vega meets the diagnosis description, the foundation of any showing of mental retardation, or show that a remand would serve no purpose. As such, Cruz's motion for judgment on the pleadings must be denied.

III. The Commissioner's Motion for Remand

The Commissioner moves for a remand for further administrative proceedings so that Vega's "possible psychological problems" can be explored using records from Mount Sinai, such as clinical notes from the group therapy program Vega attended. Not only has Cruz consented to such a remand, but it is clear that without such records, the administrative record is incomplete. Notably, in her August 26 decision, the ALJ concluded that the record contains no evidence of a "medically determinable psychiatric disorder." The documents submitted to the Appeals Council, however, which may be considered by the ALJ on remand, include clinical notes describing an incident in which Vega stabbed his grandfather in the stomach with a kitchen knife after the grandfather refused to give him something; Vega's admission evaluation for Mount Sinai's psychiatry care center, in which he is diagnosed with disruptive behavior disorder; and a letter from the lead teacher in Mount Sinai's therapeutic nursery which explains Vega's diagnosis of "oppositional defiant disorder." The new records also include a letter from Dr. Sibylle Wallace, a pediatric neurologist at Mount Sinai, explaining that Vega's seizures are of the "major motor" type and are only "partially controlled" with Dilantin. For these reasons, a remand for further administrative proceedings is entirely appropriate.

## Conclusion

For the reasons stated above, Cruz's motion for judgment on the pleadings is denied. The Commissioner's decision is remanded for further administrative proceedings.

SO ORDERED:

Dated:     New York, New York
           August 23, 2005

                                        _____
                                              DENISE COTE
                                        United States District Judge